Filed 5/15/26  Marriage of Ogden CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| In re the Marriage of JILL ANN OGDEN and GILBERT LAWRENCE OGDEN. | |
| JILL ANN OGDEN, Respondent, v. GILBERT LAWRENCE OGDEN, Appellant. | F089962 (Super. Ct. No. FL-21-002214) **OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Stanislaus County.  Joseph R. Distaso, Judge.

Gilbert Lawrence Ogden, in pro. per., for Appellant.

No appearance for Respondent.

-ooOoo-

# INTRODUCTION

In this marital dissolution case, appellant (Husband) appeals the trial court's order characterizing an investment account (E*TRADE) as community property in conjunction with an earlier ruling valuing respondent's (Wife) equity share of a second investment account (Webull) to which Husband had apparently transferred most of the original value in the E*TRADE account. As we will explain, these rulings, even considered collectively, are nonappealable interlocutory orders, we decline to exercise our power to treat the purported appeal as a petition for a writ of mandate, and we accordingly dismiss the appeal because we lack jurisdiction over it.[1]

# FACTUAL BACKGROUND

Husband and Wife married on July 2, 1994, and they separated on August 25, 2021, when Wife filed a petition for marital dissolution. They have no minor children. The matter proceeded to a long-cause hearing in April 2025. Relevant to this appeal, the parties disputed the characterization of an E*TRADE investment account. Husband argued the E*TRADE account was his separate property because the marriage was void for lack of the requisite blood tests required to obtain a marriage license in 1994 under a repealed Family Code statute. (Fam. Code, former §§ 580, 581; see Stats. 1994, ch. 197, § 1, p. 1740 [repealed].) Husband also maintained that, even if the E*TRADE account was community property, it was transmuted to his separate property pursuant to an account transfer request signed by both Husband and Wife in 2016.

## I. Relevant Trial Testimony

### A. E*TRADE Investment Account: Characterization Dispute

To establish the E*TRADE account was not community property, Husband argued the marriage was void. According to Husband, he had never undergone the blood test required under a repealed statute to obtain a marriage license in 1994. Wife testified she

---

[1] Wife did not file a responsive brief in this appeal.

believed the marriage was valid at all times between the date of their marriage and separation. She could not recall whether they underwent blood tests to obtain the marriage license.

The court declined to find the marriage void. The court reasoned that even if the marriage was void or voidable, Husband and Wife had lived together as a married couple between 1994 and 2021, and the court could divide property the couple acquired during that time as quasi-marital property. The court explained that as the putative spouse, Wife could request the property be divided as if it were community property. As such, the court ruled that either the marriage was valid, or if not, the parties acted as if the marriage was valid from the date of marriage to the date of separation, the couple's assets would be divided as quasi-marital property.

Wife testified the E*TRADE account was originally opened during their marriage. Husband testified he opened the brokerage account in his name only, and it was primarily funded with money he had acquired before marriage—but he had no documentation showing when the account was opened. Although he "added some" money to the account from his marital earnings, most of the account balance was attributable to gains in the value of the holdings. Husband testified he opened the account with ShareBuilder, which was later acquired by ING Direct. Then, in 2008, around the time Husband was recovering from a stroke, ING Direct was acquired by Capital One Investments (Capital One). When that happened, Capital One required Husband to complete paperwork transferring the account to Capital One. In completing that paperwork, Husband marked a box indicating the account was "'community'" instead of indicating the account was held individually, and Wife's name was added to the account mistakenly. It remained a joint account with Capital One from 2008 to 2016.

Husband testified that in 2016, after he realized his mistake in adding Wife to the investment account, he asked that Wife agree to transfer the account's holdings to his sole, individual account. According to Husband, Wife agreed because she had not

contributed any of her earnings to the account. The court admitted Husband's exhibit No. 1, a Capital One form entitled "Transfer Assets Between Capital One Investing Accounts." The form identified Husband and Wife as joint account owners, and indicated the funds in the account were to be transferred to another Capital One investment account held in Husband's name only. The form required all current accountholders to attest to the following to effect the transfer: **"I hereby relinquish all right, title and interest in said securities and/or monies and I irrevocably release and discharge you of any claims by me or my legal representatives with reference thereto, including and disposition thereof of such property."** (Boldface added.) Both Husband and Wife, as joint owners, signed the form to allow Capital One to transfer the account holdings to the new individual account in Husband's name only.

According to Wife's testimony, she signed this document believing it gave Husband permission to manage the account, not that she was waiving a community property interest in the account holdings. When she signed the company's transfer form, she believed there was between $200,000 and $300,000 in the account. Although she signed the form voluntarily, she noted she was subject to her Husband's "serious nagging" to do so.

### B. Dispute Over E*TRADE and Webull Account Value

Capital One Investments was later acquired by E*TRADE, and Husband opened several E*TRADE accounts to organize different types of investments. During the trial, the court asked Husband about the current balances in the E*TRADE accounts, and Husband stated the overall balance was "really low" and the "stocks are all Chinese stocks" that "crashed" about "100-something percent." In addition, some of the E*TRADE accounts were "locked" because the companies he "bought into" were small, the government would not let them be traded, and he could not get into those accounts. Husband represented the balance in the E*TRADE accounts was "less than $100,000."

4.

Wife's counsel disputed that valuation because around the time of separation, in September 2021, the E*TRADE account had over $800,000. The court indicated it would need all the balances before it could make a ruling, and the court ordered Husband to produce E*TRADE account statements from March 2024 to May 2025 for the next day's hearing.

When the issue was revisited the following day, Husband represented he had difficulty obtaining the E*TRADE account statements. He had one statement for the E*TRADE account holding Chinese stock, which had a value of $4,531. He represented the government had restricted the sale of those stocks, and nothing could be done with them presently. After the couple separated, Husband had transferred all *other* funds and/or holdings in the E*TRADE accounts to a Webull account, the stock market crashed, and he lost about 50 percent of the value in the account. Husband represented his Webull account had $418,406 as of March 31, 2025, which Wife's counsel confirmed.

Wife's counsel responded that after the prior day's hearing, she had reviewed the April 2024 E*TRADE statements Husband had produced earlier. When the parties separated, there was a balance of approximately $830,000 in one E*TRADE account. The balance in that particular account had dropped to around $230,000 by September 2023, and it was eventually closed out. Another E*TRADE account had a balance of about $300,000 at the date of separation in 2021, but it was later closed out around September 2023. Husband represented all these accounts were reflected in the current Webull investment account. Wife's counsel voiced concern that she was hearing for the first time that funds from the E*TRADE accounts were transferred to the Webull account, and indicated there may be a misappropriation issue.

Hearing these arguments, the court observed that while it had not yet decided whether the investment account was community property, the funds in the account should have been in an interest-bearing account "[b]ecause it went from [$]800,000 basically [at]

5.

the date of separation to [$]400-something thousand now. So if I had known all of this at the time, I would have ordered you to take that [$]800,000 and put it in cash or a bank account or something where it didn't go up or down. It just sat there, but I didn't know any of this until today."

The court proposed placing half the balance of the Webull account into a cash holding option, and Husband could do what he wanted with his half. Husband noted his equity in the Katherine Court house was about $400,000, so if the investment account lost value before final distribution was ordered, Wife's equity share of the Webull account could be paid out of sale proceeds on the house. Wife agreed to that arrangement, and the court ruled on the record it would not order Husband to immediately transfer the account value to a cash account, but if the investment account were deemed community property and remained community property (i.e., not transmuted in 2016), then Wife's equity share was $209,203. The court indicated it would "either order that from the E*TRADE equity account at the time I do the distribution, or if the account doesn't have sufficient funds to cover that, I'm going to order that it come from [Husband's] share of the s[ale] of the marital residence. So that secures [Wife's] potential interest in that and doesn't tie up [Husband's] money if he wants to do trading or whatever." The court then cautioned Husband that if the holdings in the investment account were devalued and could not cover Wife's equity share, it would come out of his share of the house. Husband agreed.

Wife's counsel then re-raised the dispute over valuation of the E*TRADE and Webull accounts, and requested Husband be ordered to produce a year of statements. The court ordered Husband to produce approximately a year of Webull and E*TRADE account statements within 30 days. The court indicated another hearing was required on this issue, and the matter was continued to August 2025 regarding any disputes over funds in the investment accounts.

**C.    Retirement Accounts**

Both Husband and Wife had CalSTRS pension plans and various retirement accounts. The court ruled it would order that a qualified domestic relations order (QDRO) be prepared for those accounts, which would be coordinated through a designated expert. One of Husband's retirement accounts had approximately $5,000, and the court indicated it would simply value that account and offset it with what Wife owed Husband for the sale of the car.

**II.    Court Order Summarizing Trial Rulings and Findings**

On May 13, 2025, the Court issued a "**FINDINGS AND ORDER AFTER HEARING**," which summarized the rulings it had made on the record during the trial.

The court granted dissolution of the marriage based on irreconcilable differences, effective April 29, 2025. Among other things, the court denied Husband's request to declare the marriage invalid, and found the parties acted as if the marriage was valid from the date of marriage to the date of separation. The court ordered each party was to be awarded "one-half of the community property interest in the pension and retirement accounts outlined below pursuant to Family Code §2610." After listing the various accounts, the court ordered they be divided by way of a QDRO, which was to be prepared pursuant to Family Code section 2610, subdivision (a)(3)(C), and the parties were to jointly retain a specified expert to prepare it. The court reserved jurisdiction over the pension and retirement accounts until such time as all plans are divided as ordered. The court took the E*TRADE characterization issue under submission, and ordered Husband to produce Webull and E*TRADE account statements within 30 days.

The court found that if the investment account was deemed community property, and remained community property after 2016, then Wife's equity share in the account is $209,203. "The Court will either order that from the E*Trade equity account at the time the Court orders the distribution, or if the account does not have sufficient funds, the

Court will order that the funds come from [Husband's] share of the Katherine Court sale proceeds."

The matter was continued to August 4, 2025, for a further hearing on the following items: (1) Husband's State of California Savings Plus Program 457 OBRA-PST and 401K Plans; (2) Acorn Account; (3) status of the sale of Katherine Court property; (4) disputed funds in the E*TRADE and Webull accounts; and (5) determination of an equalization payment.

On June 2, 2025, the court issued a tentative statement of decision characterizing the E*TRADE account as community property, and found it was not transmuted to separate property in 2016, as Husband maintained. Husband filed objections to the tentative statement of decision, and simultaneously filed a notice of appeal on June 5, 2025.

On July 31, 2025, the court denied Husband's objections, and adopted the tentative statement of decision as the final statement.

## DISCUSSION

### I.   Arguments on Appeal

Husband filed a notice of appeal on June 5, 2025, challenging the trial court's June 2, 2025, tentative statement of decision.

Husband's first two contentions of error are related to the characterization of his E*TRADE account as community property. As at trial, Husband argues that under the law as it existed in 1994 when they married, the marriage was invalid and void because there is no evidence Husband submitted a then-required blood test to obtain the marriage license. Without a valid marriage, and as the sole contributor to the E*TRADE account, Husband argued no community property interest could arise in the E*TRADE investment account. Second, and relatedly, Husband contends that even if the E*TRADE investment account was quasi-marital property, it was transmuted into his separate property in 2016 by virtue of a Capital One transfer-request form that Wife signed.

8.

Husband also argues the trial court erred in characterizing a pension and retirement account as community property, and he maintains the trial court violated his due process rights by failing to let him complete his rebuttal closing argument at the conclusion of the trial.

Wife did not file a responsive brief.

## II.     Appealability of the Court's Rulings

Husband's brief did not contain a statement of appealability.  (Cal. Rules of Court, rule 8.204(a)(2)(B).)  Observing Huband appeared to be prematurely challenging interlocutory, nonfinal orders, we invited Husband to file a supplemental brief addressing the appealability of the June 2, 2025, tentative statement of decision and, to the extent relevant to his claims, the May 13, 2025, order.

### A.     Legal Principles

Appellate courts have jurisdiction over a direct appeal only where there is an appealable order or judgment.  (*Griset v. Fair Political Practices Com.* (2001) 25 Cal.4th 688, 696.)  Thus, the existence of an appealable judgment or order is a jurisdictional prerequisite to an appeal, and the court is obligated to review the question of appealability.  (*Olson v. Cory* (1983) 35 Cal.3d 390, 398; *Jennings v. Marralle* (1994) 8 Cal.4th 121, 126.)  If the underlying order or judgment is nonappealable, a court ordinarily must dismiss the appeal, on its own motion if necessary.  (*Hollister Convalescent Hosp., Inc. v. Rico* (1975) 15 Cal.3d 660, 674.)

Code of Civil Procedure section 904.1 provides a list of appealable judgments and orders.  "Under Code of Civil Procedure section 904.1, subdivision (a)(1), subject to statutory exceptions …, an appeal may be taken only from 'a judgment' of the superior court.  The judgment contemplated by the statute is ""'one final judgment in an action … which in effect ends the suit in the court in which it was entered, and finally determines the rights of the parties in relation to the matter in controversy.'"""  (*In re Marriage of Garcia* (2017) 13 Cal.App.5th 1334, 1342, quoting *Bank of America v. Superior Court*

(1942) 20 Cal.2d 697, 701–702 & citing Code Civ. Proc., § 577 ["[a] judgment is the final determination of the rights of the parties in an action or proceeding"].) This statute is meant to codify the "'*final judgment rule*,'" a part of the common law under which "'a[ppellate] review of intermediate rulings should await the final disposition of the case'" to avoid "'piecemeal disposition and multiple appeals in a single action ….'" (*In re Marriage of Griffin* (1993) 15 Cal.App.4th 685, 687.)

"It is the substance and effect of the adjudication, and not the form, which determines if the order is interlocutory and nonappealable, or final and appealable." (*Doran v. Magan* (1999) 76 Cal.App.4th 1287, 1293, citing *Belio v. Panorama Optics, Inc.* (1995) 33 Cal.App.4th 1096, 1101.) If no other issues in the action "remain for further consideration," the order or decree is considered final and appealable. (*Doran, supra*, at p. 1293.) But where further judicial action is required for a final determination of the rights of the parties, the decree is interlocutory. (*Ibid.*)

**B.    Analysis**

"The intent of Code of Civil Procedure section 904.1 '… is to codify the *final judgment rule*, or rule of *one final judgment*, a fundamental principle of appellate practice in the United States. The theory is that piecemeal disposition and multiple appeals in a single action would be oppressive and costly and that a review of intermediate rulings should await the final disposition of the case.'" (*In re Marriage of Griffin, supra*, 15 Cal.App.4th at p. 687.) Here, there is no final judgment. The order from which Husband appeals does not terminate the litigation, and many property division issues remain pending. Even considering the May 13, 2025, order in conjunction with the tentative and final statements of decision regarding characterization of the E*TRADE account, these orders do not decide the characterization and division of retirement assets, nor do they finally value and divide the funds/holdings in the E*TRADE and Webull accounts, as discussed below. (See *In re Marriage of Doherty* (2002) 103 Cal.App.4th 895, 898 [a party may not appeal an interlocutory order determining an asset's character, but not

10.

dividing it]; see also *In re Marriage of Corona* (2009) 172 Cal.App.4th 1205, 1216–1218 [postjudgment order contemplating forensic accounting and special referee's findings required additional judicial proceedings to adopt findings, rendering order interlocutory and nonappealable].)

Husband acknowledges the dissolution proceedings below are not complete, and there are remaining issues regarding the Katherine Court home and retirement assets that will require further proceedings. He contends, however, that the May 13, 2025, order and the court's June 2, 2025, ruling characterizing the E*TRADE account together constitute a final determination of the E*TRADE account property dispute, and those orders are appealable under the collateral order doctrine.

The collateral order doctrine is an exception to the final judgment rule. If the trial court's ruling on a collateral issue "'is substantially the same as a final judgment in an independent proceeding' [citation], in that it leaves the court no further action to take on 'a matter which … is severable from the general subject of the litigation' [citation], an appeal will lie from that collateral order even though other matters in the case remain to be determined." (*Lester v. Lennane* (2000) 84 Cal.App.4th 536, 561.) An interlocutory order is appealable under the collateral order doctrine when it is "collateral to the main issue, dispositive of the rights of the parties in relation to the collateral matter, and direct[s] payment of money or performance of an act …." (*In re Marriage of Skelley* (1976) 18 Cal.3d 365, 368.)

In marriage dissolution cases, it has been long recognized that "disputes over division of marital property, custody of minor children and spousal support are essentially collateral to the issue of dissolving the marriage." (*In re Marriage of Van Sickle* (1977) 68 Cal.App.3d 728, 735.) Thus, orders resolving such disputes with finality in a judgment of dissolution are appealable under the collateral order doctrine. (*Id.* at pp. 735–736; *In re Marriage of Skelley, supra*, 18 Cal.3d at pp. 367–369 [recognizing appellate jurisdiction over appeal from an order reducing temporary spousal support].)

11.

Husband characterizes the court's orders about the E*TRADE and Webull accounts to constitute final rulings as to the characterization, valuation and division of that property. Husband maintains the trial court determined Wife's equity share to be $209,203 in the Webull account, and nothing was left for future litigation. According to Husband, the account statements he was ordered to produce were simply to verify the current location or remaining balance of funds, which Husband characterizes as a ministerial and enforcement-related matter having nothing to do with valuation.

Viewing collectively the court's May 13, 2025, order, the June 2, 2025, tentative statement of decision, and the court's July 31, 2025, order adopting its tentative statement of decision as its final ruling, the orders do not constitute a final valuation and division of the E*TRADE and Webull accounts. The tentative statement of decision, subsequently adopted as the final statement of decision, only characterizes the E*TRADE account as community property, it does not value or divide the funds/holdings in the account.

The court's May 13, 2025, order memorialized its trial ruling on Wife's equity share of the Webull account based on the balance as of March 31, 2025. Contrary to Husband's argument that the court ruled this was Wife's fixed and final share of the investment accounts, this ruling as to Wife's equity share was only preliminary. The order expressly indicates another hearing was set to deal with disputes over the value of these accounts, and the trial transcript confirms this was only a preliminary valuation, not a final determination of value and division of these accounts' holdings and funds.

The dispute over valuation stemmed from the fact Husband had transferred money to multiple E*TRADE accounts during the parties' separation, and then he had transferred the bulk of his E*TRADE holdings to Webull. Although Wife maintained there had been more than $830,000 in the E*TRADE accounts at the time of separation, Husband asserted he had lost half the value of his E*TRADE holdings, and the Webull account balance represented the largest bulk of what was left after those market losses.

Through counsel, Wife raised concerns about whether the March 2025 Webull account balance accurately reflected what had been in the various E*TRADE accounts, and it could not be established without documentation. In addition to dispute as to whether the Webull balance encompassed the funds previously in the E*TRADE account, Husband represented the E*TRADE account still retained various holdings, including Chinese stock and other small-company holdings that could not be moved to the Webull account. On the first day of trial, Husband represented the remaining E*TRADE holdings had less than $100,000 in value and, on the second day of trial, he represented the current balance for one E*TRADE account with nontransferable holdings was valued around $4,500. Wife's equity share in those E*TRADE holdings was not valued by the court, ostensibly because the balances remained subject to further documentation Husband was ordered to produce before the next hearing. In ruling on the Wife's equity share based on the March 31, 2025, Webull account balance, it is clear the court was making a preliminary and minimum valuation of Wife's equity share in the Webull account to secure it from additional losses.

The court expressed concern that the E*TRADE account had somehow lost approximately half of its value since the date of separation, and, at Husband's request, rather than ordering Husband to place the Webull account balance into cash holdings to prevent any additional loss in value, Husband was permitted to continue investing the funds as he chose because payment of Wife's minimum equity share would be secured by Husband's equity in the Katherine Court property. Subject to ongoing valuation disputes over the E*TRADE and Webull accounts the court had not yet resolved, the trial transcript reflects the court was carefully attempting to value and preserve Wife's minimum existing equity share (the only amount that both parties could agree on without further documentation) in advance of a final determination as to the value of the two accounts, while also balancing Husband's ability to capture value increases in the holdings by keeping them invested.

In sum, the court's May 13, 2025, order did not state a final valuation of the E\*TRADE and Webull accounts—an additional hearing and the production of documents was necessary to make final calculations. By stating Wife's equity share of the Webull account, and noting that payment would be ordered from the investment account or from Husband's equity of the Katherine Court property, the court was making an effort to secure what appeared to be the bulk of Wife's equity share while allowing Husband continued investment opportunity with the funds until the valuation was ironed out at the next hearing, subject to additional documentation. It remained to be seen what arguments Wife's counsel would present after reviewing the full documentation.

As to the nonfinality of the court's ruling on the Webull and E\*TRADE investment accounts, *In re Marriage of Grimes & Mou* (2020) 45 Cal.App.5th 408 (*Grimes & Mou*) is illustrative. In that dissolution proceeding, the husband and wife disputed the characterization of funds the couple had received from the wife's family to purchase a house during their marriage. (*Id.* at p. 411.) The house was never purchased, and although the wife had intended to return the funds, she testified her family had asked that she invest the funds on their behalf. (*Id.* at p. 413.) The wife placed the funds into her commingled brokerage account, where it made investment gains. (*Id.* at p. 412.) After trial, the court ruled the funds from the wife's family were a loan, made for a community purpose, and ordered that the debt obligation be divided equally between the parties, and all investment earnings (whether from the loaned community funds or the community's original funds in the account) were to be divided equally. (*Id.* at p. 416.)

The wife appealed before the court entered a final judgment. The appellate court held the collateral order doctrine did not apply to the court's ruling on the brokerage account because, among other things, it was not a final determination valuing and dividing the account. (*Grimes & Mou, supra*, 45 Cal.App.5th at p. 419.) The appellate court reasoned the trial court's ruling had contemplated further action by the parties to divide the funds in the brokerage account. (*Ibid.*) The court also pointed out the wife

had made an improper withdrawal from the account, and the potential investment gains from that improper withdrawal had not yet been calculated.  (*Ibid*.)

Like *Grimes & Mou*, further judicial proceedings were required to calculate the value and divide the E*TRADE and Webull accounts.  There were ongoing disputes about valuation that required further documentation, and one E*TRADE account retained at least $4,500 in value the court did not value or divide.  The court's ruling on Wife's equity share of the Webull account was only a preliminary determination, subject to further proceedings to reach a final valuation.  To be appealable under the collateral order doctrine, a court's ruling on a collateral issue must "leave[] the court no further action to take .…" (*Lester v. Lennane, supra*, 84 Cal.App.4th at p. 561; accord, *In re Marriage of Skelley, supra*, 18 Cal.3d at p. 368 [collateral order doctrine requires a decision that finally determines the rights of the parties in relation to a collateral matter, leaving no further acts to be done by the court in regard to that matter].)  As the court's May 13, 2025, order, in conjunction with the tentative and final statements of decision regarding the accounts' characterization, did not finally value and divide the E*TRADE and Webull accounts, the court's rulings on this issue cannot be appealed under the collateral order doctrine.

Husband additionally challenges the court's May 13, 2025, order with regard to a pension and retirement account he asserts the court erroneously characterized as community property.  However, the court did not characterize any of these retirement assets—other than one retirement account Husband does not challenge, all retirement accounts were to be divided by a QDRO prepared by a jointly retained expert, which had not yet been done.  The court had not characterized those assets, and they were subject to further calculation.  The May 13, 2025, order was not a final determination as to the couple's retirement assets, including those Husband challenges on appeal.  Without a final determination of the retirement assets, the May 13, 2025, order regarding those assets is also not appealable under the collateral order doctrine.

### III. We Decline to Construe the Appeal as a Writ

Husband alternatively requests that his appeal be construed as a petition for a writ of mandate.

Although appellate courts have the power to construe an appeal from a nonappealable order as a petition for a writ of mandate, that power is not to be exercised "except under unusual circumstances" (*Olson v. Cory, supra*, 35 Cal.3d at p. 401) that are compelling enough for the issuance of a petition for writ in the first instance (*Doran v. Magan, supra*, 76 Cal.App.4th at p. 1294). In making this determination, courts frequently consider (1) whether there is a lack of clarity as to whether the order at issue was appealable; (2) the lack of an adequate remedy at law caused by the fact that a delay in the resolution of the issue might lead to "'unnecessary trial proceedings'"; and (3) the existing briefing and record to consider the appeal as a writ. (*Steven N. v. Priscilla C.* (2026) 119 Cal.App.5th 639, 654–655, citing and quoting *Olson v. Cory, supra*, at pp. 400–401.)

There is no doubt the trial court's orders of May 13, 2025, and its tentative and final statements of decision are not appealable. There is no final judgment, and the trial court had made no final valuation of the investment accounts or most of the couple's retirement assets, among other things, and further action from the court was necessary to complete valuation and division. There are potential disputes regarding the value of the Webull account, no valuation was made of the remaining holdings in the E*TRADE account, and Husband was in the process of producing additional documentation regarding these investment accounts that neither the court nor opposing counsel had yet reviewed.

When the trial court has completed its valuation and division of the assets, there is a plain, speedy and adequate remedy through a timely appeal. In other words, this is not an issue that will evade review if we decline to construe the appeal as a writ petition. (*In re Marriage of Lafkas* (2007) 153 Cal.App.4th 1429, 1434–1435.)

The record on appeal is insufficient to review the trial court's orders regarding the investment accounts because the court had not finally valued or divided them.  Were we to reach only the characterization issue, it would not necessarily finally decide the matter.  Specifically, if the trial court's characterization were deemed correct, the investment accounts would still require final valuation and division by the trial court, which could be subject to additional appellate challenges.  On the other hand, if we concluded the trial court erred, it would vitiate the need to litigate any issue of valuation or division, but this is not the only asset that must be characterized, valued and divided before the dissolution proceedings can reach a final conclusion.  Neither of these possibilities provides any compelling reason to construe Husband's appeal as a writ petition.  (*In re Marriage of Lafkas, supra*, 153 Cal.App.4th at p. 1435 [declining to treat trial court's nonappealable ruling as to characterization of business interest as a writ petition because further trial court proceedings would be required no matter the outcome on appeal].)

Husband asserts that if the appeal is dismissed and not treated as a writ petition, the investment account funds may be distributed to Wife, and Husband might be forced to seek recovery after the fact, potentially after funds have been spent, transferred, or otherwise made difficult to restore.  This risk, however, is only speculative as both parties have significant assets, and there are potential avenues Husband may pursue to stay execution of the judgment pending appeal, should it be deemed necessary.

**DISPOSITION**

The appeal is dismissed.  In the interests of justice, Husband shall bear his own costs on appeal.  (Cal. Rules of Court, rule 8.278(a)(5).)


                                                                    MEEHAN, J.

WE CONCUR:


LEVY, Acting P. J.


FRANSON, J.